# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

LERA SCHULZE,

        Plaintiff,

v.

UNITED STATES OF AMERICA,

        Defendant.

Case No. 18-CV-00130-GKF-JFJ

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment [Doc. 21] of defendant the United States of America. For the reasons set forth below, the motion is granted.

## I. Background

This is a wrongful death case brought by plaintiff Lera Schulze against the United States of America for the death of her husband, John G. Schulze. On June 8, 2017, John Schulze reported suicidal thoughts to a nurse practitioner, Tiffany Richey. Richey contacted Oklahoma City Veterans Affairs Health Care System Medical Center ("VA Hospital") regarding treatment for Mr. Schulze. Thereafter, law enforcement escorted Mr. Schulze to the VA Hospital. A VA Hospital healthcare provider assessed Mr. Schulze at 1:04 p.m., and the VA Hospital discharged Mr. Schulze at 3:03 p.m. that same day. Two days later, on June 10, 2017, John Schulze died of a self-inflicted gunshot wound.

In this lawsuit, plaintiff alleges defendant breached the standard of care by releasing Mr. Schulze on June 8, 2017, rather than admitting him for extended mental health treatment. Plaintiff asserts a single claim for wrongful death pursuant to OKLA. STAT. tit. 12, § 1053.

## II. Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). The inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a [finder of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III. Undisputed Material Facts

The following facts are undisputed for summary judgment purposes.

In 2017, John Schulze was a fifty-three-year old Army veteran. Mr. Schulze was married to plaintiff Lera Schulze, and the couple resided in Pawnee, Oklahoma.

On February 16, 2017, Mr. Schulze first sought treatment for depression with psychiatrist Dr. Linda Evans. [Doc. 22, p. 5, ¶¶ 1-2; Doc. 34, p. 2, ¶¶ 1-32]. On March 22, 2017, Mr. Schulze

was admitted to the VA Hospital, presenting with occupational stress, depressed mood, anxious distress, and feelings of being overwhelmed and powerless. [Doc. 22, pp. 5-6, ¶¶ 5-6; Doc. 34, p. 2, ¶¶ 1-32]. During his stay, Mr. Schulze engaged in therapy, including group therapy, and completed a Suicide Prevention Safety Plan. [Doc. 22, p. 6, ¶¶ 8 and 10; Doc. 34, p. 2, ¶¶ 1-32]. Mr. Schulze's Suicide Prevention Case Manager, Selonda Moseley, determined that no recommendation for a "High Risk Patient Record Flag" activation would be made for Mr. Schulze because he denied suicidal ideation prior to his admission.[1] [Doc. 22, p. 6, ¶ 9; Doc. 34, p. 2, ¶¶ 1-32; Doc. 22-8]. Mr. Schulze was discharged on March 24, 2017. [Doc. 22, p. 7, ¶¶ 12 and 14; Doc. 34, p. 2, ¶¶ 1-32].

In April of 2017, Mr. Schulze expressed suicidal thoughts to his son and plaintiff. [Doc. 34-6, pp. 30:3 to 31:14]. On April 8, 2017, Mr. Schulze presented to the VA Hospital Emergency Department with depression and suicidal thoughts, and was voluntarily admitted. [Doc. 22, p. 7, ¶ 16; Doc. 34, p. 2, ¶¶ 1-32]. On April 10, 2017, Ms. Moseley noted that Mr. Schulze reported suicidal ideations without a plan or suicidal behavior, and that he had no history of suicide attempts. Therefore, she did not recommend a Patient Record Flag for Suicide at that time, but she noted that he could be re-evaluated at a later time if a heightened risk was present. [Doc. 22, p. 8, ¶ 18; Doc. 34, p. 2, ¶¶ 1-32; Doc. 22-14]. During Mr. Schulze's April stay at the VA Hospital, plaintiff and her sons went through the Schulze residence and secured all of the guns that they

---

[1] The "High Risk Patient Record Flag" is used only to identify patients at high risk of suicide for the duration of the increased risk of suicide and appears in the patient's electronic medical record when any health care provider assesses the record. [Doc. 22-10, p. 1, ¶ 5].

3

could find.  [Doc. 22, p. 8, ¶ 19; Doc. 34, p. 2, ¶¶ 1-32; Doc. 34-6, p. 33:6-21].  Mr. Schulze was discharged on April 14, 2017.  [Doc. 22, p. 8, ¶ 21; Doc. 34, p. 2, ¶¶ 1-32].

On June 8, 2017, Mr. Schulze attended an appointment with Tiffany Richey, APRN.  Ms. Richey noted:  "[Mr. Schulze] was asked about current thoughts of suicide and confirms that he does think about it.  He states he does have a plan that includes overdosing on medication and other means that were not defined specifically."  [Doc. 22, p. 10, ¶ 30; Doc. 34, p. 2, ¶¶ 1-32; Doc. 22-20, p. 1].  Ms. Richey informed plaintiff that Mr. Schulze admitted to being suicidal and that Ms. Richey could not let Mr. Schulze leave.  Although plaintiff stated she would take Mr. Schulze to the VA Hospital, Ms. Richey stated that law enforcement would have to take him.  [Doc. 22, p. 10, ¶ 31; Doc. 34, p. 2, ¶¶ 1-32].  Ms. Richey noted, in pertinent part,

> John went willingly without aggressive threats with the officer; however, this increased his agitation and anxiety.  He verbalized his concern of losing his new job if he were to be admitted to the hospital.  Lera stated to myself that she understood the concern for John's wellbeing related to the verbalization of suicide and plan.  She conveyed this to John and this seemed to calm him.

[Doc. 22, p. 10, ¶ 32; Doc. 34, p. 2, ¶¶ 1-32; Doc. 22-20, pp. 2-3].  Ms. Richey sent the following Third Party Statement with law enforcement to be given to VA Hospital personnel:

> Pt (John) verbalized to me that he has had suicidal thoughts for the last couple months.  He stated he had/has a plan including overdosing on meds and if that wasn't available he has other means available to him.  He is currently anxious and having suicidal thoughts.

[Doc. 22, p. 10, ¶ 33; Doc. 34, p. 2, ¶ 33; Doc. 22-21].

When Mr. Schulze arrived at the VA Hospital, nurses assessed Mr. Schulze and noted he stated he was not suicidal and did not want to hurt himself or anyone else.  [Doc. 22, p. 11, ¶ 35; Doc. 34, p. 2, ¶¶ 35-37].  Mr. Schulze was seen by Dr. Chandresh Dave, M.D. at approximately 1:04 p.m.  Dr. Dave noted Mr. Schulze as presenting with depression and suicidal ideations, and arranged for Mr. Schulze to be seen by a staff psychologist—Charlotte Rosko, Ph. D.  [Doc. 22,

4

p. 11, ¶¶ 36-37; Doc. 34, p. 2, ¶¶ 35-37]. Before speaking with Mr. Schulze, Dr. Rosko briefly reviewed the records from Mr. Schulze's two previous admissions and noted that his records did not indicate that he had been flagged with a High Risk Patient Flag but that he had completed a Safety Plan. [Doc. 22, p. 11, ¶ 37; Doc. 34, p. 2, ¶¶ 35-37]. Dr. Rosko then assessed Mr. Schulze, and noted the following:

> Patient determined to not be in imminent danger at this time. Although admitted to suicidal thoughts of overdosing on medication, Veteran denied any intent to act on these thoughts. He said he would not do it because he would not want to hurt his wife or his family. Veteran has been depressed about retirement, job situation and his tics for the last 4-5 months. The Veteran recently medically retired from the Army last week. He quit a job 2 weeks ago but is supposed to begin a new job on Monday which he is looking forward to starting.
>
> The plan is for him to follow up with his psychologist in Stillwater and keep his appointment with Dr. Patel on July 19. He does not want to have Telemental Health but OKC is 1.5 hours away and he is worried about enough leave time. Plans to see private Psychologist Dr. Evans on Monday 6/12. Provided him and his wife with number to contact AMHC if he should decide to change to a psychiatrist in OKC. Wife assured the provider that guns were removed already and agreed to put away his medication in case he has any further suicidal thoughts. Already had crisis number information. Currently denied SI/HI. Will cc Juanita Celie for Suicide Prevention.

[Doc. 22-26]. Dr. Rosko advised Mr. Schulze to follow up with Dr. Patel and Dr. Yen. [Doc. 22, p. 12, ¶ 39; Doc. 34, p. 2, ¶ 39]. During their assessments, Dr. Dave and Dr. Rosko found Mr. Schulze denied current suicidal or homicidal ideations, he was not violent, he did not present as a substantial risk of harm to himself or others, he was not threatening suicide, and he appeared to be capable of caring for himself and his needs. [Doc. 22-10, p. 2, ¶ 13; Doc. 22-25, p. 1, ¶ 5]. The VA Hospital Emergency Department discharged Mr. Schulze at 3:03 p.m. on June 8, 2017. [Doc. 22, p. 12, ¶ 43; Doc. 34, p. 3, ¶¶ 42-43]. Plaintiff testified that, at the time of discharge, Mr. Schulze was not threatening suicide or any kind of self-inflicted harm, nor was he displaying violent behavior. [Doc. 22-1, pp. 62:20 to 63:5 and 64:2-6].

After leaving the VA Hospital, plaintiff and Mr. Schulze went to Stillwater to have dinner with one of their sons and then went home. [Doc. 22, p. 13, ¶ 46; Doc. 34, p. 3, ¶¶ 45-56]. Subsequently, one of Mr. Schulze's friends called and asked Mr. Schulze to go bow shooting with him later that night and Mr. Schulze agreed. [Doc. 22, p. 13, ¶ 47; Doc. 34, p. 3, ¶¶ 45-56]. When he returned home, Mr. Schulze asked plaintiff to look up a new drug that he was interested in trying. [Doc. 22, p. 13, ¶ 48; Doc. 34, p. 3, ¶¶ 45-56]. According to plaintiff, Mr. Schulze was in "decent spirits that night." [Doc. 22, p. 13, ¶ 49; Doc. 34, p. 3, ¶¶ 45-56]. The next day, June 9, 2017, Mr. Schulze worked on a tractor with one of his brothers and looked at the stars with plaintiff. [Doc. 22, p. 13, ¶¶ 50, 52-53; Doc. 34, p. 3, ¶¶ 45-56]. The next morning, June 10, 2017, Mr. Schulze committed suicide by gunshot wound to the head at approximately 7:18 a.m. [Doc. 22, p. 13, ¶ 54; Doc. 34, p. 3, ¶¶ 45-56].

The Department of Defense's *Guidelines for the Assessment and Management of Patients at Risk for Suicide* lists three criteria for a patient's transition to a less restrictive setting than inpatient hospitalization: (1) clinician assessment that the patient has no current suicidal intent; (2) the patient's active psychiatric symptoms are assessed to be stable enough to allow for reduction of level of care; and (3) the patient has the capacity and willingness to follow the personalized safety plan (including having available support system resources). [Doc. 22, p. 12, ¶ 42; Doc. 34, p. 3, ¶¶ 42-43]. Defendant's expert, psychologist R. Eric Nelson, Ph.D., found no guidelines defining how long a potentially suicidal patient should remain when he or she is denying active suicidal ideation or plan. [Doc. 22, p. 13, ¶ 55; Doc. 34, p. 3, ¶¶ 45-56]. Dr. Nelson opined that, once at the VA Hospital,

> [Mr. Schulze] denied that he was actively suicidal. He stated that he often experienced suicidal thoughts, but would not act on them as he did not want to put his family through that pain. It is my professional opinion and belief that, under

these circumstances, the ED professionals had little choice but to discharge him to the least restrictive environment available, namely, his home.

[Doc. 22, p. 14, ¶ 56; Doc. 34, p. 3, ¶¶ 45-56; Doc. 22-28, pp. 5-6].

## IV. Analysis

As previously stated, plaintiff asserts a single claim for wrongful death pursuant to OKLA. STAT. tit. 12, § 1053, alleging defendant acted negligently in releasing Mr. Schulze on June 8, 2017, rather than admitting him for mental health treatment.

Pursuant to § 1053,

> When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, or his or her personal representative if he or she is also deceased, if the former might have maintained an action, had he or she lived, against the latter, or his or her representative, for an injury for the same act or omission.

12 OKLA. STAT. § 1053(A). "[I]n order to recover damages for wrongful death alleged to have been caused by negligence, the plaintiff must establish that the defendant failed to exercise proper care in the performance of some legal duty owed to the decedent and that the negligent breach of this duty was the proximate cause of death." *Runyon v. Reid*, 510 P.2d 943, 948 (Okla. 1973).

With regard to proper care, under Oklahoma law, a physician's standard of care is measured by national standards. 76 OKLA. STAT. § 20.1; *see also Wofford v. E. State Hosp.*, 795 P.2d 516, 520 (Okla. 1990) ("[A] psychiatrist has a duty to exercise reasonable professional care in the discharge of a mental patient."). Expert testimony is ordinarily necessary to establish the standard of care in professional negligence cases. *See Boxberger v. Martin*, 552 P.2d 370, 373 (Okla. 1976); *see also Roberson v. Jeffrey M. Waltner, M.D., Inc.*, 108 P.3d 567, 569 (Okla. Civ. App. 2005) ("It is well settled that in all but the extraordinary medical malpractice case, the plaintiff has the burden of producing expert testimony to support a prima facie case of negligence.").

Plaintiff submits no admissible evidence to establish the standard of care in this case. Plaintiff relies on the opinion and testimony of Dr. Gary A. Rouse, licensed clinical psychologist. *See* [Doc. 34-5 and Doc. 34-8]. However, this court determined in its April 1, 2017 Opinion and Order that Dr. Rouse's opinions are unreliable under the *Daubert* standard and therefore inadmissible. *See* [Doc. 40]. Further, plaintiff submits the "Psychotherapy Termination Note," dated June 14, 2017 of Dr. Evans, which includes Dr. Evans's opinion that "[the VA] simply didn't keep him long enough." [Doc. 34-7]. However, plaintiff did not identify Dr. Evans as a witness providing expert testimony, and opinions as to the standard of care are beyond the scope of permissible treating physician testimony under FED. R. EVID. 701 and 702. *See* [Doc. 41]. Accordingly, plaintiff provides no expert testimony to establish the applicable standard of care.[2]

Plaintiff argues this case may nevertheless proceed pursuant to the doctrine of *res ipsa loquitur*. The Oklahoma legislature codified the doctrine of *res ipsa loquitur* in the context of

---

[2] Even if the court were to consider the inadmissible evidence, the evidence is insufficient to withstand summary judgment. Dr. Evans's Note states only that defendant "didn't keep [Mr. Schulze] long enough" and includes no opinion as to how long defendant should have "kept" Mr. Schulze or the basis for that opinion. The Note is insufficient to satisfy plaintiff's burden. *See Benson v. Tkach*, 30 P.3d 402, 405 (Okla. Civ. App. 2001) (concluding affidavit that opined only that defendant breached the standard of care and proximately caused injury was insufficient to withstand summary judgment). As for Dr. Rouse's opinions, Dr. Rouse opines that the VA Hospital should have admitted Mr. Schulze because he was escorted to the VA Hospital by law enforcement and he reported suicidal ideations to Richey. *See* [Doc. 34-5 and Doc. 34-8]. Dr. Rouse offers no basis for his assertion that whether a patient is escorted by law enforcement is a relevant consideration to determine whether inpatient treatment is necessary in cases of mental health crises. Further, Dr. Rouse does not specifically rebut Dr. Nelson's conclusion that, under the circumstances, pursuant to the *Guidelines for the Assessment and Management of Patients at Risk for Suicide* and the applicable standard of care "the ED professionals had little choice but to discharge [Mr. Schulze] to the least restrictive environment available, namely, his home." [Doc. 22-28, p. 6]; *see also* [Doc. 22, p. 14, ¶ 56; Doc. 34, p. 3, ¶¶ 45-56]. Nor do the materials submitted with plaintiff's response brief suggest an alternative standard of care beyond admission into the hospital in all cases of suicidal ideations. It is well-established that "the testimony of an expert can be rejected on summary judgment if it is conclusory and thus fails to raise a genuine issue of material fact." *Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999). Thus, the evidence, inadmissible here, also fails to raise a genuine dispute of material fact.

medical negligence claims in OKLA. STAT. tit. 76, § 21. *Sisson ex rel. Allen v. Elkins*, 801 P.2d 722, 724 (Okla. 1990). Pursuant to § 21,

> In any action arising from negligence in the rendering of medical care, a presumption of negligence shall arise if the following foundation facts are first established:
>
> 1. The plaintiff sustained any injury;
>
> 2. Said injury was proximately caused by an instrumentality solely within the control of the defendant or defendants; and
>
> 3. Such injury does not ordinarily occur under the circumstances absent negligence on the part of the defendant.
>
> If any such fact, in the discretion of the court, requires a degree of knowledge or skill not possessed by the average person, then in that event such fact must be established by expert testimony.

76 OKLA. STAT. § 21. Plaintiff must establish the three foundational facts for the doctrine to apply. *Sisson ex rel. Allen*, 801 P.2d at 725; *see also Harder v. F.C. Clinton, Inc.*, 948 P.2d 298, 303 (Okla. 1997) ("*Once the foundation facts for res ipsa loquitur are established*, negligence may be inferred from the injurious occurrence without the aid of circumstances pointing to the responsible cause.") (internal footnote omitted) (emphasis altered from original). "Whether a case is fit for the application of *res ipsa loquitur* presents a question of law" and "[i]t is a judicial function to determine if a given inference may be drawn from a proffered set of circumstances." *Harder*, 948 P.2d at 303 (emphasis altered from original).

Under the circumstances and based on the evidence presented, application of *res ipsa loquitur* is inappropriate in this case. First, *res ipsa loquitur* is an evidentiary rule; thus, "as in all negligence cases, there must be a duty owed by the defendant to the plaintiff." *Williams v. New Beginnings Residential Care Home*, 225 P.3d 17, 26 (Okla. Civ. App. 2009). As previously stated, plaintiff offers no admissible evidence of the standard of care owed by defendant to plaintiff.

9

Second, plaintiff presents no evidence with respect to the second foundational fact—that plaintiff's injury was proximately caused by an instrumentality solely within the control of the defendant. To satisfy this requirement, Oklahoma law requires proof that "[t]he nature and degree of control must be such that the reasonable probabilities point to the [defendant] and support an inference that it was the negligent party." *Harder*, 948 P.2d at 306. "The purpose of requiring the defendant's control is to provide the basis for an inference that whatever negligence was involved *may be charged to the defendant*." *Id.* at 306 n. 36 (emphasis added). Thus, in a decision persuasive to this court, the Oklahoma Court of Civil Appeals declined to find error in a trial court's decision not to give a *res ipsa loquitur* instruction. *See Hedrick v. Hardt*, 359 P.3d 203, 208-09 (Okla. Civ. App. 2015). There, the court first noted that its "research yield[ed] no Oklahoma medical negligence cases addressing application of § 21's statutory presumption under circumstances where a plaintiff's actions and/or inactions have been alleged to be either a contributing or direct cause of the injury." *Id.* at 208-09. Thus, the court turned to the RESTATEMENT (SECOND) OF TORTS § 328D(I), which states

> the inference of negligence does not point to the defendant *until the plaintiff's own conduct is eliminated as a responsible cause*. Where the evidence fails to show a greater probability that the event was due to the defendant's negligence than that it was caused by the plaintiff's own conduct, the inference of the defendant's responsibility can not be drawn.

*Id.* at 209 (emphasis in original).

In this case, it is undisputed that, when Mr. Schulze arrived at the VA Hospital, nurses assessed Mr. Schulze and noted he stated he was not suicidal and did not want to hurt himself or anyone else. [Doc. 22, p. 11, ¶ 35; Doc. 34, p. 2, ¶¶ 35-37]. Further, Dr. Rosko, staff psychologist, assessed Mr. Schulze and recorded that he denied any intent to act on suicidal ideations due to his desire to avoid hurting his family. Dr. Rosko also documented plaintiff's assurance that she had

removed all the firearms from the family home and her intent to put away Mr. Schulze's medications. [Doc. 22-26]. Prior to her assessment, Dr. Rosko reviewed Mr. Schulze's medical records, which indicated that, on two prior occasions, Suicide Prevention Case Manager Moseley had not recommended a "High Risk Patient Record Flag." [Doc. 22, pp. 6, 8, and 11, ¶¶ 9, 18, and 37; Doc. 34, p. 2, ¶¶ 1-32 and 35-37]. A second physician, Dr. Dave, also recorded that, during his assessment, Mr. Schulze denied current suicidal ideations, he was not threatening suicide, and he did not present as a substantial risk of harm to himself. [Doc. 22-25, p. 1, ¶ 5]. In fact, plaintiff admits that, at the time of discharge, Mr. Schulze was not threatening suicide or any kind of self-inflicted harm. [Doc. 22-1, pp. 62:20 to 63:5 and 64:2-6]. The VA Hospital discharged Mr. Schulze during the afternoon of June 8, and he did not commit suicide until a day and a half later on the morning of June 10, 2017. [Doc. 22, p. 13, ¶ 54; Doc. 34, p. 3, ¶¶ 45-56].

Based on the record before the court, plaintiff presents no evidence that Mr. Schulze was under defendant's exclusive control at time at the time of his death or that circumstances that occurred while Mr. Schulze was within defendant's control caused his death. Nor does plaintiff establish any duty with respect to Mr. Schulze. Under the circumstances, defendant's conduct is simply too attenuated to Mr. Schulze's death, and the undisputed record does not permit an inference that plaintiff's injury was proximately caused by an instrumentality solely within the control of the defendant. Thus, plaintiff fails to establish the second foundational fact and *res ipsa loquitur* is inapplicable.

Finally, *res ipsa loquitur* is inapplicable for the additional reason that plaintiff presents no admissible evidence to establish the third foundational fact—that such injury ordinarily does not occur under the circumstances absent negligence on the part of the defendant. Plaintiff offers no admissible expert evidence that suicide does not usually occur under these circumstances (a day

and half following discharge after a patient is evaluated for mental health treatment) absent negligence by the mental health provider.[3] This foundational fact is necessary for the statutory presumption of negligence to apply and "cannot be supplied by inference." *Sisson ex rel. Allen v. Elkins*, 801 P.2d at 725.

Nor is this foundational fact within the knowledge of the average person. *Cf. Smith v. Hines*, 261 P.3d 1129, 1137 (Okla. 2011). As recognized by the Oklahoma Supreme Court, "[p]sychiatry is not an exact science," and a certain amount of uncertainty is inherent within the analysis. *Wofford*, 795 P.2d at 520. Accordingly, expert testimony is necessary with respect to mental health treatment. *See Williams*, 225 P.3d at 30 (Okla. Civ. App. 2009); *see also Addington v. Texas,* 441 U.S. 418, 429 (1979) (in context of involuntary commitment, reasoning "[w]hether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists") (emphasis in original); *Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 183, 190-91 (2d Cir. 2005) (involuntary commitment requires expert testimony); *Smith v. United States*, No. 10-CV-112, 2011 WL 4899933, at *17 n. 17 (M.D.N.C. Oct. 14, 2011) (collecting cases rejecting *res ipsa loquitur* in mental health treatment). Plaintiff fails to establish a necessary foundation fact and therefore *res ipsa loquitur* is inapplicable. *See Grayson v. State ex rel. Children's Hosp. of Okla.*, 838 P.2d 546, 550-51 (Okla. Civ. App. 1992) (declining to apply statutory presumption of negligence when no evidence offered that drug overdose is something that does not occur absent negligence).

---

[3] Even if the court were to consider Dr. Rouse's report and testimony, nothing therein opines that, under similar circumstances to Mr. Schulze's treatment, suicide would not occur absent negligence by the mental healthcare provider. *See* [Doc. 34-5 and 34-8].

Plaintiff submits no evidence to establish an element of her claim—namely, that defendant failed to exercise proper care in the performance of a legal duty. Thus, defendant is entitled to judgment as a matter of law. *See Duckett v. United States*, No. CIV-09-259-D, 2010 WL 3909340, at *3 (W.D. Okla. Sept. 30, 2010).

## V. Conclusion

WHEREFORE, defendant the United States of America's Motion for Summary Judgment [Doc. 21] is granted.

IT IS SO ORDERED this 8th day of April, 2019.

_____
GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE